Filed 8/10/26  P. v. Chiriac CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

     Plaintiff and Respondent,

v.

EMANUEL CHIRIAC,

     Defendant and Appellant.

E086177

(Super.Ct.No. RIF138126)

OPINION

APPEAL from the Superior Court of Riverside County.  Charles J. Koosed, Judge. Affirmed.

Ava R. Stralla, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, Robin Urbanski and Caelle Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

1

In July 2009, defendant and appellant Emanuel Chiriac was convicted of committing a lewd act on the victim who was under the age of 14, a violation of Penal Code section 288, subdivision (a).[1]  The jury was hung on two other counts of committing a lewd and lascivious act with force under section 288, subdivision (b), also committed against the victim.  In 2011, defendant entered guilty pleas to two counts of violating section 288, subdivision (a).  He was placed on formal probation for a period of five years for all counts.

Defendant filed an appeal in which we affirmed his conviction in an unpublished opinion filed on August 10, 2011, *People v. Chiriac*, E050864 [nonpub. opn.] (Opinion).  In October 2024, defendant filed a motion to vacate his convictions pursuant to section 1473.7, subdivisions (a)(1) and (a)(2).  He claimed he was actually innocent of the charges based on newly discovered evidence and that he was not properly advised of the immigration consequences when he pled guilty to the two additional section 288, subdivision (a), offenses.  A hearing was held in February 2025; the victim testified that her father forced her to make the accusations against defendant and recanted her trial testimony.  After hearing the testimony, the trial court issued a written order denying defendant's section 1473.7 motion.  It found that defendant failed to provide new evidence of actual innocence based on finding the victim's recantation of her testimony not credible, and that defendant failed to show a reasonable probability that he suffered prejudice due to the failure to advise him of the immigration consequences of his plea.

---

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

On appeal, defendant asks this court to exercise its independent review of the court's order denying his motion pursuant to section 1473.7 and grant him a new trial. He claims that he showed by a preponderance of the evidence that newly discovered evidence of actual innocence existed, which required that his convictions be vacated. He further claims that he established there was a reasonable probability he suffered prejudice because he was not properly advised and did not meaningfully understand the immigration consequences of proceeding with the trial, and also in entering the guilty pleas.

For the reasons set forth below, we shall affirm the trial court's order.

## FACTUAL AND PROCEDURAL HISTORY[2]

"A.  *PROSECUTION*

"The victim testified that in May of 2006, when she was 13 years old, defendant (her uncle by marriage) asked her if she wanted to go to the store with him; she agreed. Defendant drove to a nearby 'golf park.' They got out of the car and walked down a hill to the park. The victim lay down in the grass; defendant lay down beside her. He asked her if she was a good kisser; the victim told him that was none of his concern. Nevertheless, defendant repeatedly asked her for a kiss. The victim kept telling him 'No.' He leaned in to kiss her; she relented and kissed him for about 10 seconds. Defendant told the victim she was a good kisser.

---

[2]  The factual history is drawn from the Opinion.

3

"Soon thereafter they saw smoke arising from a nearby home. They got up, went to the car, and drove to the fire. A fire truck responded. They watched the fire for several minutes but then returned to the same spot where they parked before.

"Defendant locked the doors of the car so that the victim could not exit. He asked her if she wanted to see his penis; she told him he was stupid. Defendant pulled his pants halfway down, revealing his erect penis. Defendant asked her if she wanted to suck his penis; he told her to 'suck his dick.' She told him no; nonetheless, he continued to ask and told her he would not take her home until she did. The victim was scared; she did not know what to do. She repeatedly told him no. Defendant then grabbed her head and pulled it down toward his penis; he used 'hard force.' She unsuccessfully tried to pull away. Defendant told her to 'suck his dick.' The victim again told him she did not want to; however, she started to orally copulate him because she wanted to go home and thought defendant would kill her if she did not. Defendant ejaculated into her mouth after approximately 30 seconds; he unlocked the door so the victim could open it and spit out his semen. Defendant warned her if she ever told anyone he would kill her. He then drove her back to her grandmother's house.

"They never went to the store. When they returned, another uncle asked them why they had returned without groceries. The victim did not tell anyone what had happened because she remained scared of defendant.

"The victim testified that on another occasion approximately two months later and sometime prior to July 9, 2006, the victim and her mother spent the night at defendant's apartment. The victim's mother had engaged in an argument with the victim's father,

4

necessitating that she stay somewhere else. The victim wanted to go with her mother to stay at defendant's apartment. She slept in the living room with her mother. The next morning, her mother and defendant's wife, Claudia, went to the store while the victim was still sleeping.

"The victim awoke and went to the restroom. Defendant knocked on the door and told her to come out. She asked him why; he said he wanted to talk. The victim exited the restroom because she believed her mother had returned to the apartment. Defendant was sitting on the edge of his bed; he told her sit on the bed. She declined. He got up off the bed and pulled her onto it with both his hands. She told him to stop before her mother and Claudia returned. He told her they were not coming back. Defendant bent her down over the bed so she was lying on her stomach.

"The victim attempted to fight defendant off but was unable to overcome him because he had both his hands on her back. While still holding down on her back with his left hand, he pulled her pants halfway down with his right hand. Defendant moved her underwear to the side. The victim kept telling him to stop; she was scared and crying. Defendant pulled down his pants and put his penis inside her vagina; it hurt. She continued to resist and repeatedly told him to stop. After 25 to 30 seconds, defendant ejaculated. Defendant then saw the victim's mother and Claudia entering the apartment complex. Defendant went into the bathroom to clean himself. The victim pulled up her pants and went into the living room; defendant told her not to say anything or he would kill her. She did not tell anyone because she was scared defendant would kill her.

5

"The victim eventually told her cousin what defendant had done to her during the first incident. Her cousin told the victim's boyfriend, who told her uncle, who told her mother; her mother questioned her regarding the incident. When her mother approached her, she revealed the details of the first incident. After everyone found out what had occurred, defendant again threatened to kill her unless she denied everything. The victim denied anything had occurred between her and defendant when first confronted by her boyfriend and uncle; she did so because she was scared defendant would kill her.

"The victim's mother, father, and grandmother then brought her to the police station, where she reported the first incident. However, she did not initially provide every detail of the episode. Likewise, she did not report the second incident because she was nervous and scared. At a later date, when she spoke to another officer, she reported the second incident. The victim initially reported she was unsure if defendant penetrated her during the latter occurrence; at trial, she testified she was certain he did because it hurt. The victim could not testify as to whether defendant's penis had any distinguishing characteristics or whether he was circumcised, though she testified he shaved his pubic hair.

"Rachelle Walker, the owner of a home near the golf park, testified that the fire department was called to her home sometime between May and July 2006. One of the victim's uncles and one of her aunts both testified they recalled the victim going to the store with defendant and returning without groceries on one occasion. The victim's mother testified she and the victim stayed overnight at defendant and Claudia's apartment prior to July 9, 2006. The victim's mother left the apartment at one point and returned to

6

find the victim crying. She heard about the first incident from her brother. The victim's mother, the victim, the victim's father, and the victim's grandmother all drove to the police department to report the incident.

"The victim's . . . boyfriend (her husband at the time of trial), testified he heard rumors regarding an incident between the victim and defendant from the victim's cousin; he confronted the victim, but she initially denied the rumors. He later overheard a telephone conversation between the victim and defendant in which the victim reported to defendant that her family knew what had occurred between them; defendant told her to deny everything or he would kill her. The victim's [boyfriend] then confronted her and she revealed everything. The victim's [boyfriend] admitted that he never told anyone, prior to his testimony, about overhearing the phone conversation; he did not do so because he had an outstanding warrant for his arrest.

"B.   *DEFENSE*

"The victim's grandmother testified she went to the police station with the victim, and the victim's mother and father on June 27, 2007. On the way to the police station, the victim's father coached the victim what to tell the police. She testified the victim was a liar.

"Defendant's wife, Claudia, testified defendant had a large birthmark on his penis, was uncircumcised, and had never shaved his pubic hair. The victim's father had Claudia sign a mortgage on a home for him; she asked that her name be removed from the mortgage when he started to make late payments. Although Claudia's name was eventually removed from the mortgage, the victim's father threatened her that someday

she would be made to pay for her decision. While the victim's mother spent several nights at her apartment, the victim never did. Claudia testified the victim was a 'big liar.' "

B.     PROCEDURAL HISTORY

An amended information was filed on July 27, 2009, charging defendant with three counts of lewd and lascivious behavior with a minor under the age of 14 by force or duress (§ 288, subd. (b)(1)). The jury found him guilty of one count of the lesser offense of a violation of section 288, subdivision (a), but hung on the remaining two counts. Defendant was placed on five years' probation and was to register as a sex offender pursuant to section 290.

On March 16, 2011, defendant entered a guilty plea to two counts of violating section 288, subdivision (a), and the prosecutor dismissed the section 288, subdivision (b), counts. Defendant signed the plea agreement on March 16, 2011. He initialed the term "If I am not a citizen of the United States, I understand that this conviction may have the consequences of deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States." He also initialed, "I have had adequate time to discuss with my attorney (1) my constitutional rights, (2) the consequences of any guilty pleas, and (3) any defenses I may have to the charges against me." The defense attorney also attested, "I am satisfied that (1) the defendant understands his/her constitutional rights and understands that a guilty plea would be a waiver of those rights; (2) the defendant has had an adequate opportunity to discuss his/her case with me, including any defenses he/she may have to the charges; and (3) the

defendant understands the consequences of his/her guilty plea. I join the decision of the defendant to enter a guilty plea."

The trial court took the plea in open court on March 16, 2011. Defendant entered a guilty plea to the two counts of violating section 288, subdivision (a). The trial court asked defendant, "You understand that you're giving up the various rights of the trial, which are enumerated on this yellow plea form?" Defendant responded, "Yes, sir." Defendant also acknowledged that he had reviewed the plea form with his attorney and that he understood it. Defendant stated that he signed the plea form and that he was not being forced to take the plea. The trial court asked if he understood he would be placed on probation, and he responded, "Yes sir." The trial court asked, "You understand the other consequences of the plea, as they're enumerated on this plea form?" Defendant responded, "Yes."

Defendant was placed on probation for a period of five years with credit for time served of 181 days. Defendant's convictions were affirmed on appeal. On July 13, 2023, defendant appeared in court on a probation violation. It was determined that his probation ended in 2015 and the probation violation was dismissed.[3]

C.     MOTION TO VACATE HIS CONVICTION AND SET ASIDE PLEA

On October 18, 2024, defendant filed his "Notice of Motion and Motion to Vacate Past Convictions and Set Aside No Contest Plea Pursuant to Penal Code section 1473.7" (all caps and boldface omitted; hereafter, the Motion). He relied on his own declaration

---

[3] Defendant filed a prior motion to vacate his conviction on April 2, 2021. It was denied on procedural grounds and is not relevant to the current motion.

9

and a declaration from the victim. He insisted that he was actually innocent of the charges as the victim had recanted her trial testimony. He also raised two claims of ineffective assistance of counsel. He first claimed that he received misleading advice from his trial counsel at trial. He insisted that his trial counsel forced him to a jury trial, that his counsel expressed confusion about the case, mixed up witnesses and the timeline of events. His counsel also failed to properly prepare defendant for trial. He also received ineffective assistance of counsel on the plea agreement, which was different counsel. His counsel advised him to take a plea deal, and provided no advice, and did not explain the potential immigration consequences. His convictions subjected him to deportation.

He provided a declaration from Carlos Valdez, an attorney at the U.S. Law Center. Valdez declared that a conviction for a violation of section 288, subdivision (a), carried adverse immigration consequences. If he had been defendant's counsel at the time the plea was entered, he would have chosen an "immigration safe charge" such as a violation of section 32 (accessory after the fact).

Defendant provided a declaration. He was a citizen of Romania. He became a legal permanent resident on April 11, 2013. He left the United States in April 2013 due to death threats made against him and his wife, a United States citizen, from the victim's father (Father). In July 2014, Father murdered his own wife and then committed suicide.

Defendant was currently in removal proceedings due to his conviction. He stated, "I would have never accepted the trial nor the guilty plea if I understood the immigration consequences that a guilty conviction had on my immigration status." He was unable to

10

seek relief from his removal proceedings based on his convictions. He further stated, "At the time of the plea, I did not comprehend that this conviction would adversely affect my future immigration status. My attorney did not advise me that this trial outcome would impact my immigration status. Attorney Lapine did not discuss trying to get a plea deal that would not impact my immigration status or advise me to consult with an immigration attorney misleading me into the guilty plea. I would have chosen to proceed differently if I were properly informed by an attorney of the immigration consequences. If I knew the risk of harsh immigration consequences trigged by this guilty conviction, I would not have accepted the trial and its outcome." He would not have entered a guilty plea to a violation of section 288, subdivision (a), if he was aware of the immigration consequences.

Defendant provided a letter written by the victim. It stated, "I [the victim] am writing this letter to clarify my feelings of remorse I have been feeling with regret what I had to do and what I was told to do what my father at a very young age. My dad was telling me to say that [defendant] raped me. That didn't happen, [t]he threats that he made against people he actually did in that really scared me because I was afraid, that he would do the same to me if I didn't listen to what he said. [¶] So in conclusion none of this happened he didn't touch me he didn't rape me. I was just told what to say frequently. It has taking me a long time to write this down. But I can no longer live with this guilt. Thank you so much." (*Sic.*) Defendant also provided with the Motion a notice to appear from the Department of Homeland Security for removal proceedings on October 21, 2024, based on his convictions.

11

The People filed opposition to the Motion. They contended the plea form included sufficient notice of the immigration consequences. Defendant's uncorroborated assertion that he was not aware of the immigration consequences was insufficient based on the record. Defendant only presented his self-serving statements in the declaration that he would not have accepted the plea were he aware of the immigration consequences. There was no evidence prior to the trial that he sought to negotiate for a lesser charge. The People further argued that even if he had negotiated a different plea, he still would have the conviction of the one section 288, subdivision (a), offense based on the jury trial.

The People also argued the claim of actual innocence did not entitle defendant to relief. The victim had recanted her trial testimony 14 years after trial. The defense at trial was that Father forced the victim to make up the story. There was evidence prior to the trial that defendant was pressuring witnesses, and it was possible defendant pressured the victim to recant her testimony.

Defendant filed a supplemental brief in support of the Motion on January 10, 2025. Defendant argued the victim had now come forward based on Father's death.

Defendant filed a second supplemental brief in support of the Motion on February 10, 2025. Another declaration from the victim was provided. It was dated "3/31/19" and provided as follows: "1. I was the complaining witness in the People of the State of California v. Emanuel Chiriac (RIF138126) [¶] 2. During the case, I testified that, in May 2006, [defendant] kissed me and forced me to perform oral sex on him. [¶] 3. I also testified that approximately two months later, [defendant] raped me. [¶] 4. My testimony was false. [¶] 5. I gave that testimony at the direction of my father, . . . [¶] 6.

12

[Defendant]never committed the acts, against me, for which he was convicted. [¶] 7. I have received no compensation or benefit from making this statement. [¶] 8. I am giving this statement of my own free will." It was signed under penalty of perjury.

Defendant's wife (Wife) also provided a declaration that she had hired Michael LaCilento to represent defendant. She asked him several times if the case would impact defendant's asylum status and was assured by counsel that it would not. LaCilento never advised her to consult with an immigration lawyer or seek guidance from immigration counsel."

Prior to the hearing, on February 13, 2025, defendant provided a declaration from the victim's uncle (Uncle). Uncle declared that on July 19, 2014, Father came to his house. Father shot and killed his own wife, the victim's mother. Father then tried to kill Uncle and other persons at the house before finally shooting himself. The victim confided in Uncle that she lived in constant fear of her father, and that Father made her make the accusations against defendant. Uncle declared that Father was evil and heartless.

D.    HEARING ON MOTION

The hearing was held on February 20, 2025. Defendant was not present but was represented by counsel. He was in federal immigration custody.

The victim was born in August 1992. The victim testified that defendant was married to her aunt. She explained that Father hated her mother's family and wanted to kill the entire family. In 2014, he shot one of her other uncles and he killed the victim's mother. He then shot himself in the head.

13

She recalled that she testified in court in 2007. She admitted testifying that defendant had sexually abused her but that it was not true. He never "did any of that to me at all." She explained that Father had gotten into her head. He told her that he did not like defendant and his wife. She testified "He just told me what to say, like I said," because he did not like her aunt and defendant, and wanted them out of their lives. She admitted that the day of the fire, she and defendant went to the park together but he never kissed her. Father got mad at her for going to the park with defendant so he "put things" in her head "that he did things to me, which was not true." Defendant had never touched her inappropriately. Everything she told the police and testified to at trial was false.

On cross-examination, the victim admitted she spent a lot of time with defendant at the time of the accusations. Father told her many times what to say to the police officers and got into her head. The victim first told her cousin (Cousin), and then her grandmother (Grandmother), about the sexual abuse by defendant before she went to the police. The victim claimed Father's death "liberated" her to tell the truth about defendant. She first stated that only her mother and Grandmother knew that what the victim testified to was not true but she later testified that she told Cousin that Father had told her what to say. The victim insisted that Father told her to make sure she said that she "sucked his dick" and "he comes in your mouth." At 15 years old, she knew that defendant was going to get in trouble. She never told the police that Father had told her to make statements about sexual abuse because she was afraid that Father would get in trouble, and she thought he would go to jail forever. She was not sure why she told Cousin and Grandmother that Father was telling her what to say. The victim described

14

Father as being "psycho" and "mental." Father was the "happiest man alive" when defendant was convicted.

Grandmother testified defendant was her son-in-law. She recalled that sometime in 2007, she drove to the police department with the victim and Father. During the drive, Father told the victim to tell the police that she was sexually abused by defendant. Grandmother recalled that the victim was to tell "all of the sexual misconduct and sexual assaulting." Grandmother could see that the victim was very afraid of Father. Grandmother could not recall the exact words that Father told the victim to say. She recalled something about Father saying defendant forced her to have sex with him. Grandmother could not recall speaking with the police in 2007. She never told the police that Father forced the victim to make the accusations against defendant. When asked why she never told the police that the victim was lying, despite being close to defendant, she responded, "I didn't know. I didn't know how did I know. I didn't know what happened. I didn't know what was happening. I didn't know."

Wife testified she had been married to defendant for 18 years. Defendant and Father got into a confrontation in 2006 about a property Wife had bought for Father that was in her name. After the confrontation, Father threatened her and defendant. Wife had always known the accusations against defendant were not true. She also stated that Grandmother had testified at the trial in 2009 that the victim was lying because of Father. Wife hired a lawyer in 2019, and the victim told the lawyer that she lied in her testimony. Wife hired the lawyer because, after Father died, the victim told her that she was no longer afraid of Father and felt guilty about lying.

15

At the end of the hearing, the trial court noted there were two issues. First, it appeared that defendant pleaded guilty to two counts of his own free will. Second, he was convicted by a jury at trial of violating section 288, subdivision (a). Even if the trial court agreed there was new evidence, and defendant was entitled to a new trial on the one conviction, the plea would still stand. Defendant's counsel responded that the newly discovered evidence applied to both the trial and plea. He would not have pleaded guilty if there had not been the jury verdict. The victim's live testimony showed that she provided false testimony at trial. This was new evidence that showed actual innocence. The convictions should be vacated under section 1473, subdivision (a)(2), and he was entitled to a new trial on all three charges.

The prosecutor argued that the victim's testimony in court that day "was not very believable," especially given the other evidence. She was evasive in answering questions. Further, Wife's testimony did not prove that Father coached the victim as to what to say to the police. The only evidence was that Father was taking the victim to the police station to report sexual abuse but there were no specifics about what she was told to say by Father. Further, Father passed away in 2014 but the victim did not come forward until 2019. The jury had already heard Wife's testimony and had already evaluated her credibility.

As for immigration consequences, defendant was able to get his permanent resident card in 2013, well after his convictions. Further, defendant lived outside the United States from 2013 until 2023. There was only defendant's self-serving declaration

16

that he would not have entered a guilty plea had he known of the immigration consequences. The matter was taken under submission.

E. TRIAL COURT'S WRITTEN RULING

The trial court's written ruling was filed on March 25, 2025. The court stated that it had reviewed the Motion, the People's opposition, supplemental briefing by defendant, all declarations and exhibits, and had observed the testimony presented at the hearing. The court then reviewed the evidence from trial and the procedural background of the case.

The trial court first addressed the immigration consequences claim. The court found that defendant was claiming that his plea to the two charges of violating section 288, subdivision (a), was invalid because he was not properly advised of the immigration consequences of his plea and that he did not meaningfully understand the consequences. The court recounted defendant's factual support for the claim. It noted the declaration from Carlos Valdez in which Valdez stated that a violation of section 288, subdivision (a), carried adverse immigration consequences. Valdez stated that had he been defendant's attorney, he would have sought an immigration safe plea or would have taken the case to trial. The court also noted that defendant provided his own declaration in support of the claim. Defendant had come to the United States as an asylee in 2002. He married Wife and became a lawful permanent resident in 2013. Defendant, Wife, and their four children left the United States for several years due to threats from Father. He had been served with a notice to appear in federal removal court due to his convictions in the instant case.

17

The trial court found that "even assuming defendant was misadvised or misunderstood the immigration consequences of his pleas," he failed to establish a reasonable probability he suffered prejudice. It found, "The only evidence to establish prejudice is defendant's self-serving, long after-the-fact statements regarding what he would have done." Defendant was married to a United States citizen at the time of the plea, and there was no evidence of his priorities when he pleaded guilty, or what his aversion to immigration consequences would have been at the time. The court noted that at the time of the plea, defendant had already been convicted of violating section 288, subdivision (a), which exposed him to immigration consequences. Defendant was facing two serious offenses if he proceeded to trial and could have been sentenced to state prison. The court concluded that the plea bargain permitted defendant to avoid a second trial, avoid being convicted of more serious charges, and avoid being sentenced to prison. It concluded, "Under these circumstances, defendant has failed to establish a reasonable probability that he would have rejected the plea bargain and chosen to again take the charges to trial." The claim for relief on these grounds was denied.

As for the actual innocence claim, the trial court recounted the letter written by the victim and the declaration dated March 31, 2019, that was submitted with the Motion. The trial court also reviewed the victim's testimony at the hearing, which it found was consistent with her written statements.

The trial court found that the victim's recantation was not credible. "During her testimony at the hearing, she did not answer questions directly and was vague in her answers." The trial court noted that she only discussed one incident in her testimony, but

18

there were two incidents at trial. She stated at the hearing that her father told her to tell the police that defendant had kissed her and forced her to perform oral sex. However, at trial, she also described an incident in which defendant "violently raped her. This apparent discrepancy was not addressed."

The trial court also noted that the victim stated Father's death liberated her to tell the truth, but he died in 2014 and she did not come forward until many years later. In the 10 years since Father's death, she never went to the police or the district attorney. The trial court also found that the victim "testified that she lied in order to get defendant in trouble and that the reason she did not tell law enforcement that [Father] was forcing her to lie was because she did not want [Father] to get in trouble and potentially spend the rest of his life in jail. If this were the case, it makes little sense that she would have told [Cousin] and [Grandmother] that [Father] was making her lie, thus putting him at risk of being caught and facing the consequences that [the victim] said she was hoping to avoid. Further, there was no corroborating testimony from [Cousin] or [Grandmother.]"

The trial court also found, "It appears [the victim]'s credibility was strongly challenged at trial, with her grandmother testifying that she was a liar and that she was coached by her father, and with defendant's wife testifying that she was a liar and challenging her description of defendant's private parts. There was also other corroborating evidence of her testimony at the trial, such as the individuals who questioned why defendant and [the victim] returned home from a trip to the grocery store without any groceries and [the victim]'s boyfriend's testimony that he heard defendant threaten to kill [the victim] if [s]he did not deny that anything happened."

19

The trial court found that defendant failed to establish that the victim's recantation constituted new evidence of actual innocence. The Motion was denied.

## DISCUSSION

A.     <u>ACTUAL INNOCENCE</u>

Defendant contends the trial court erred by denying the Motion as he showed by a preponderance of the evidence that there was newly discovered evidence of his actual innocence.

"Section 1473.7, subdivision (a)(2) provides in pertinent part that '[a] person who is no longer in criminal custody may file a motion to vacate a conviction' on the basis that '[n]ewly discovered evidence of actual innocence exists that requires vacation of the conviction or sentence as a matter of law or in the interests of justice.' A motion based on newly discovered evidence must be filed 'without undue delay from the date the moving party discovered, or could have discovered with the exercise of due diligence, the evidence that provides a basis for relief under this section.' [Citation.] Section 1473.7, subdivision (e)(1) provides in part that '[t]he court shall grant the motion to vacate the conviction ... if the moving party establishes, by a preponderance of the evidence, the existence of any of the grounds for relief specified in subdivision (a).' Thus, the defendant has the burden to demonstrate entitlement to relief under section 1473.7." (*People v. Perez* (2020) 47 Cal.App.5th 994, 997 (*Perez*).)

In *People v. Vivar* (2021) 11 Cal.5th 510 (*Vivar*), the California Supreme Court addressed for the first time the standard of review of section 1473.7 motions by the appellate court in a case involving section 1473.7, subdivision (a)(1), the immigration

consequences. "In *Vivar*, the court endorsed the independent standard of review. [Citation.] Under independent review, we exercise our independent judgment to determine whether the facts satisfy the rule of law. [Citation.] When appellate courts engage in independent review, they should be mindful that independent review is not the equivalent of de novo review. [Citation.] An appellate court may not simply second-guess factual findings that are based on the trial court's own observations. [Citation.] Factual determinations that are based on the credibility of witnesses the trial court heard and observed are entitled to particular deference, even though courts reviewing such claims generally may reach a different conclusion from the trial court on an independent examination of the evidence, even where the evidence is conflicting. [Citation.] In section 1473.7 motion proceedings, appellate courts should similarly give particular deference to factual findings based on the trial court's personal observations of witnesses.' " (*People v. Manzanilla* (2022) 80 Cal.App.5th 891, 903, citing to *Vivar*, *supra*, 11 Cal.5th at pp. 524-528.)

The *Vivar* court did not state that such review also applies to review of a 1473.7, subdivision (a)(2), claim of actual innocence. As such, it is not settled as to the proper standard of review for section 1473.7, subdivision (a)(2), motions. In *Perez*, *supra*, 47 Cal.App.5th 994, this court reviewed the denial of a section 1473.7, subdivision (a)(2), motion for an abuse of discretion. (*Id.* at p. 997.) The trial court's ruling was correct under both standards of review.

Initially, the trial court observed the victim at the time she testified at the hearing and was in the best position to assess the credibility of her testimony. The trial court

21

ruled that the victim's recantation testimony was not credible as she was vague and did not answer the court's questions directly during the hearing. "In section 1473.7 proceedings, appellate courts should similarly give particular deference to factual findings based on the trial court's personal observations of witnesses." (*Vivar*, *supra*, 11 Cal.5th at pp. 527-528.) The trial court's determination that the victim's testimony at the hearing was not credible is sufficient to deny the Motion.

Further, the trial court found that her credibility was also questionable given that there were two incidents of sexual abuse to which she testified at trial. At trial, she testified regarding the fact that defendant asked her to go to the grocery store. Instead, they went to a park where he forced her to kiss him and orally copulate him while they were in his car. She also testified that approximately two months later, she and her mother stayed the night at defendant's house. Her mother and Wife left the house. While they were gone, defendant forced her onto the bed, put his penis inside her vagina, and ejaculated. He threatened to kill her if she told anyone. The trial court noted she did not address this second incident in her testimony at the hearing. Defendant responds that no one ever asked her about the second incident. Despite no one asking the victim about the second incident, the trial court could reasonably question why she failed to address that issue and that it impacted her credibility.

The trial court was also concerned that, despite Father dying in 2014, which the victim claimed liberated her, she did not come forward with her declaration until 2019. Further, she never went to the police or district attorney, choosing to speak with

22

defendant's counsel instead. This supported the trial court's reluctance to accept that the victim was truthful in recanting her trial testimony.

The trial court also properly considered that defendant may be influencing the victim. The victim's boyfriend testified at trial that he overheard defendant tell the victim, who had already told some of her family members about the sexual abuse, that she needed to deny the accusations or he would kill her. The victim also testified at trial that after each incident, defendant threatened to kill her if she told anyone. It was reasonable to surmise the defendant had influenced the victim to change her testimony.

Additionally, other evidence corroborated the victim's testimony at trial, including the victim's testimony that there was a fire the day he kissed her in the park, and the boyfriend overhearing defendant and the victim talk about the sexual abuse. Whether the ruling on the Motion is under independent review or abuse of discretion, the trial court properly determined that the recantation by the victim was not credible and did not show by a preponderance of the evidence that defendant was innocent.

Defendant failed to demonstrate he was entitled to relief under section 1473.7 by evidence that he was actually innocent of the charges. (*Perez*, *supra*, 47 Cal.App.5th at p. 997.) The Motion was properly denied on this ground.

### B. IMMIGRATION CONSEQUENCES OF PLEA

Defendant contends he is entitled to have the Motion granted in order to withdraw his guilty plea on the two counts of violating section 288, subdivision (a), under section 1473.7, subdivision (a)(1), because he established by a preponderance of the evidence

23

that he was neither properly advised nor did he meaningfully understand the immigration consequences of his plea. He would not have taken the plea nor gone to trial.

Mandatory deportation from the United States is an immigration consequence when a defendant is convicted of a crime deemed an aggravated felony under federal immigration law. (*Moncrieffe v. Holder* (2013) 569 U.S. 184, 187-188; 8 U.S.C. § 1227(a)(2)(iii) [aggravated felony is conclusively presumed deportable].) A violation of section 288, subdivision (a), constitutes an aggravated felony that is a deportable offense under federal law. (8 U.S.C. § 1101(a)(43)(A) [defining aggravated felony as "murder, rape, or sexual abuse of a minor"].)

"To prevail under section 1473.7 [subd. (a)], a defendant must demonstrate that his conviction is 'legally invalid due to prejudicial error damaging [his or her] ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence.' [Citation.] The defendant must first show that he did not meaningfully understand the immigration consequences of his plea. Next, the defendant must show that his misunderstanding constituted prejudicial error." (*People v. Espinoza* (2023) 14 Cal.5th 311, 319.) "[S]howing prejudicial error under section 1473.7, subdivision (a)(1) means demonstrating a reasonable probability that the defendant would have rejected the plea if the defendant had correctly understood its actual or potential immigration consequences. When courts assess whether a petitioner has shown that reasonable probability, they consider the totality of the circumstances. [Citation.] Factors particularly relevant to this inquiry include the defendant's ties to the United States, the importance the defendant

placed on avoiding deportation, the defendant's priorities in seeking a plea bargain, and whether the defendant had reason to believe an immigration-neutral negotiated disposition was possible." (*Vivar*, *supra*, 11 Cal.5th at pp. 529-530.)

We independently review the decision of the trial court. (*Vivar*, *supra*, 11 Cal.5th at pp. 527-528.)

Defendant insists that if he understood there were alternative, immigration-neutral resolutions possible, he would have advised his counsel to negotiate an immigration-neutral plea even if it required significant time in jail to avoid deportation. He relies on his own declaration. He claims he has demonstrated that in 2009, he did not understand the potential immigration consequences of going to trial and was not given proper immigration admonitions prior to his entering guilty pleas. Defendant provides no objective evidence to support his self-serving claims that he would not have accepted the plea if he had been properly advised as to the possible immigration consequences. "[W]hen a defendant seeks to withdraw a plea based on inadequate advisement of immigration consequences, we have long required the defendant corroborate such assertions with ' "objective evidence." ' " (*Vivar*, *supra*, 11 Cal.5th at p. 530.) There is no objective evidence that defendant would not have accepted the plea bargain.

Further, there is no evidence that he could have pleaded guilty to a charge that had no immigration consequences. Defendant had been charged with two violations of violating section 288, subdivision (b), and it is inherently unlikely that the People would have accepted anything less than violations of section 288, subdivision (a). (See *People v. Espinoza*, *supra*, 14 Cal.5th at p. 323 [alternative immigration-safe dispositions depend

on many factors, including the seriousness of the charges].)  At this time, defendant had already been convicted of a violation of section 288, subdivision (a), which subjected him to deportation; there was no objective evidence to corroborate his factual assertions in the Motion that he would not have accepted the plea bargain or that he could have negotiated a plea that did not have immigration consequences.

He also insists he was never given the proper admonition by the trial court pursuant to section 1016.5, subdivision (a).  He notes that the written plea form only advised that there "may" be immigration consequences, not that there "will" be immigration consequences as required by section 1016.5.  The People concede that the admonition should have been given in that it was almost virtually certain defendant would be deported based on his aggravated felony conviction.  (*People v. Lopez* (2022) 83 Cal.App.5th 698, 712-713.)  The People contend the issue has been waived due to defendant not first seeking to vacate his guilty plea in the lower court based on the inadequate admonition.

We need not decide the issue, as even if we were to conclude that defendant met his burden of establishing he was not properly advised or understood the possible immigration consequences, he still cannot show prejudice.  The trial court found that there was no prejudice based on defendant already being convicted of a deportable offense.  Defendant only contends that he would not have gone to trial if he were aware of the immigration consequences if he were found guilty.  As recognized by the People, defendant provides no alternative to what he would have done if he had not gone to trial or pled guilty.  He fails to explain what he would have done to avoid the immigration

26

consequences. He was charged by the People and could only plead guilty or go to trial. Further, as noted by the People, defendant does not provide a "reasonable" alternative to which he could plead guilty to avoid the immigration consequences. Valdez declared that he would have suggested accessory after the fact, but defendant committed his offenses alone.

Under the totality of the circumstances, defendant cannot show there was a reasonable probability that he would have rejected the plea if he had correctly understood its actual or potential immigration consequences. Defendant was already convicted of a deportable offense. He was facing two serious charges, both of which would have likely resulted in a state prison sentence. Defendant was granted probation for three violations of section 288, subdivision (a), and cannot show he would have rejected the plea based on immigration consequences, especially in light of already being convicted of a deportable offense. The trial court properly denied the Motion.

## DISPOSITION

The trial court's denial of defendant's motion to vacate his convictions under section 1437.7, subdivision (a)(1) and (a)(2), is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____
J.

We concur:

McKINSTER _____
Acting P. J.

CODRINGTON _____
J.

27